UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

OLDCASTLE PRECAST, INC.,                        :

                Plaintiff,       :

    - against -                                 :

UNITED STATES FIDELITY & GUARANTY         :
COMPANY,
                              :

                Defendant.       :
- - - - - - - - - - - - - - - - - - - - X

**ECF CASE**

05 Civ. 3800 (WCC)

**OPINION**
**AND ORDER**

**A P P E A R A N C E S :**

                  WELBY, BRADY & GREENBLATT, LLP
                  **Attorneys for Plaintiff**
                  11 Martine Avenue
                  White Plains, New York 10606

PAUL G. RYAN, ESQ.

        Of Counsel

                  TORRE LENTZ GAMELL GARY &
                    RITTMASTER, LLP
                  **Attorneys for Defendant**
                  100 Jericho Quadrangle, Suite 309
                  Jericho, New York 11753

BENJAMIN D. LENTZ, ESQ.

        Of Counsel

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff Oldcast Precast, Inc. ("Oldcastle") brings this action for breach of contract against defendant United States Fidelity and Guaranty Company (the "surety"). The surety brings a counterclaim against Oldcastle for breach of the same contract. The action was tried by the Court without a jury. The following opinion sets forth the Court's Findings of Facts and Conclusions of Law pursuant to FED. R. CIV. P. 52(a).

## BACKGROUND

### I.     Procedural History

Oldcastle commenced this action on April 11, 2005 claiming breach of contract and seeking payment on a bond issued by the surety to guarantee the obligations of Klewin Building Company, Inc. ("Klewin") in connection with a construction contract. The surety filed its answer on July 1, 2005, and amended it on February 28, 2006 to assert a counterclaim for breach of contract.

### II.     The Trial

The Court conducted a two-day bench trial on August 28-29, 2006. Oldcastle presented three witnesses as part of its case-in-chief: (1) Brian Tinneny, Assistant Vice President of Contracts at Oldcastle; (2) Donna Reuter, Vice President of Project Services at Oldcastle; and (3) Joseph Navarro, Director of Field Operations at Oldcastle. Defendant presented two witnesses: (1) Stephen Tufaro, former Senior Project Manager for Klewin; and (2) William F. Carlson, PE, an expert in construction scheduling, management of construction and civil/structural engineering. Oldcastle presented no rebuttal case.

1

During the trial, the Court admitted into evidence more than one hundred exhibits, including the subcontract and change orders as well as documents relating to backcharges based on expenses incurred by Klewin for welding, saw cutting, cleanup and punchlist work, and Carlson's expert report.

The Findings of Fact and Conclusions of Law set forth below, pursuant to FED. R. CIV. P. 52(a), are based on the record developed over the course of the trial during which both parties had a full and fair opportunity to present their cases to the Court.

## FINDINGS OF FACT

This case involves the construction of a senior housing development known as the Woodlands Senior Housing Project (the "project") in Ardsley, New York.  (ASAF ¶ 1.)[1]  Ardsley Housing Associates, LLC ("Ardsley"), the owner of the property on which the project was being constructed, entered into a construction agreement with Klewin on September 30, 2002 (the "contract") whereby Klewin would serve as the construction manager for the project.  (*Id.*)  The surety issued on behalf of Klewin a Performance Bond, No. SW4915, and a Payment Bond, No. SW4915.  (*Id.* ¶ 2.)  Each bond was dated October 2002, in the principal amount of $32,400,000, on behalf of Klewin, as principal, and in favor of Ardsley, as obligee.  (*Id.*)

---

[1]  Citations herein take the following form:  "ASAF ¶ __" refers to the Amended Statement of Agreed Facts submitted to the Court on August 28, 2006; "Tr. __" refers to the consecutively paginated trial transcript; "Pl. Ex. __" refers to plaintiff's exhibits; "Def. Ex. __" refers to defendant's exhibits; "__ PTB __" refers to the designated party's Post Trial Brief submitted to the Court on September 11, 2006; and "__ Reply PTB __" refers to the designated party's Reply Post Trial Brief submitted to the Court on September 18, 2006.

A.      **The Subcontract Agreement**

In December 2002, after the contract was executed, Klewin began negotiations with Oldcastle for a subcontract to fabricate and erect precast concrete components for the project (the "subcontract"). (ASAF ¶ 3; Def. Ex. A.[2])  Klewin provided Oldcastle with a standard AIA subcontractor form agreement, which was modified, after negotiations, by an extensive list of amendments and additions. (Tr. 7, 9; Def. Ex. A.)  Pursuant to this agreement, Oldcastle was to provide all the precast concrete planks for the project. (Tr. 40.)  Articles 3.3.1. and 15.6, providing for liquidated damages, were deleted.[3] (Tr. 11; Def. Ex. A ¶¶ 3.3.1, 15.6.)

The subcontract contains several provisions that are relevant to this lawsuit.  First, the subcontractor assumed "the entire responsibility and liability for all work, supervision, labor and materials provided" and assumed liability "[i]n the event of any loss, damage, or destruction." (Def. Ex. A ¶ 4.1.11.)  Next, the subcontract specifically includes language indicating that, "[w]ith respect

---

[2] Defendant's exhibit A is a copy of the subcontract.  This document contains several sections which include: a twenty-two page AIA standard form agreement with numbered paragraphs; schedules A-H; seven pages of subcontract alterations; ten pages of Oldcastle's contract proposals; and thirty-nine pages of AIA "Draft" pages.  Citations to the first twenty-two pages will appear as "Def. Ex. A ¶ __"; citations to the schedules will be "Def. Ex. A, Sch. __ at __"; citations to the subcontract alterations will be "Def. Ex. A, alt. at __"; citations to Oldcastle contract proposals will be "Def. Ex. A, OCP at __"; and citations to the "Draft" pages will be "Def. Ex. A, Draft ¶ __."

[3] Article 3.3.1 stated, "Liquidated damage for delay . . . shall be assessed against the Subcontractor only to the extent caused by the Subcontractor or any person or entity for whose acts the Subcontractor may be liable, and in no case for delays or causes arising outside the scope of this Subcontract." (Def. Ex. A ¶ 3.3.1.).  Article 15.6 stated, "Subcontractor shall be liable to Contractor for liquidated damages provided for in the Contract Documents or for damages for any delays beyond the project completion date for which Contractor is held responsible by reason of the failure of Subcontractor to prosecute the Work diligently and properly." (*Id.* ¶ 15.6.)

3

to the obligations of both the Contractor and the Subcontractor, time is of the essence."[4]  (Def. Ex. A ¶ 9.4.)  Finally, the contractor and other subcontractor agreed not to access any floor areas until those areas were released by Oldcastle. (Def. Ex. A ¶ 4.1.11., alt. at 2.)

Prior to entering into the subcontract in April 2003, the parties had discussed an erection schedule that anticipated completion of the project by the end of August 2003.  (ASAF ¶ 6; Def. Ex. OO.)  According to the initial schedule, Oldcastle's portion of the construction was to be completed by August 18, 2003; however this schedule was repeatedly revised.  (Tr. 41-42, 62-63; Def. Ex. OO.)  Although the schedule was not incorporated into the agreement, the subcontract states that "The price quoted in this proposal is based upon the completion of our work on or before 8/31/2003." (Def. Ex. A, OCP at 6.)  The parties also contemplated a general schedule for shop drawings and fabrication.  The relevant provision states: "Shop Drawings: 1st drawing out 4-6 weeks after written notice to proceed.  Subsequent drawings to follow after approval of first.  Fabrication: 6-8 weeks after receipt of approved shop drawing and fully executed contract."  (Tr. 14-15; Def. Ex. A, OCP at 8.)  The construction schedule, under the terms of the subcontract, could be modified by mutual agreement to coordinate the overall project schedule and work of the various trades. (Tr. 15-16; Def. Ex. A, Sch. A at F.5.)

With respect to claims the contractor could make against the subcontractor, the subcontract contains a section entitled "Claims by the Contractor" which provides that if the contractor wants to make claims for "services or materials provided by the [s]ubcontractor," it was required to provide

---

[4] Brian Tinneny stated that there was not a specific schedule attached to the subcontract.  (Tr. 14.)  The signature page of the subcontract lists documents considered to be part of the subcontract and attached to defendant's exhibit A. (Def. Ex. A at 22.)  The last document listed on the signature page as "Schedule I- Project Schedule," is not attached to defendant's exhibit A and the Court has been unable to locate this document anywhere in the record.

seven days written notice, except in an emergency.  (Def. Ex. A ¶ 3.3.2.)  However, the subcontract also contains a section entitled "Contractor's Remedies," which requires forty-eight hours written notice and allows the subcontractor an additional forty-eight hours to cure any deficiency if the contractor was dissatisfied with the subcontractor's work.  (Def. Ex. A ¶ 3.4.2.)  The subcontractor was also responsible for cleanup or for backcharges if it failed to comply with this provision.  (Def. Ex. A, Sch. A at D.1.-D.3.)  The contractor was required to provide forty-eight hours written notice to the subcontractor for the first occurrence of non-compliance, and thereafter could continue cleanup at subcontractor's expense.  (Def. Ex. A, Sch. A at D.3.)

The subcontract price was $1,389,300.  (ASAF ¶ 3.)  Each payment application required the inclusion of "evidence satisfactory to Contractor and Owner that all obligations resulting from Subcontractor's performance to the point have been satisfied."  (Def. Ex. A ¶ 11.1.2.)  Oldcastle subcontracted with a design company known as FDG, Inc. ("FDG") to prepare the engineering and detail drawings for the project.  (Tr. 33, 52.)  While working on the project, Klewin on occasion dealt directly with FDG.  (Tr. 33; Pl. Ex. 14.)

On March 13, 2004, the parties agreed, by change order No. 17, to increase the subcontract price by $887.04, making the total price of the subcontract $1,390,187.04.  Oldcastle left the project in early 2004 having substantially completed the work it was required to perform under the contract.  (ASAF ¶ 7; Tr. 81-82, 87,140, 155-56; Pl. Exs. 2, 21, 23; Def. Exs. NN at 18, SS, HHH.)  Despite Klewin's claims that Oldcastle's work was defective, it paid Oldcastle at each stage of the work.  (Tr. 165-68; Def. Exs. AAA-GGG.)  In total, Oldcastle has been paid $1,197,876 by Klewin pursuant to the subcontract.  (ASAF ¶ 8; Tr. 168-69; Def. Ex. A ¶ 11.1.2.)

5

B.    **Schedule Delays and Problems**

Many of the difficulties with the project stem from problems with the project designs.  (Tr. 53; Pl. Ex. 4.)   Joseph Navarro of Oldcastle testified that, "[i]n general it appeared that the architecturals did not match up with the structurals.  There were a lot of problems with closing out dimensions, clarifying information.  They were not easily interpreted for lack of information or confusion between the two different sets of the architecturals or structurals."  (Tr. 53.)  Stephen Tufaro of Klewin also stated that "[t]he biggest problems were that the design architect and engineer on the job did not dimension the structural drawings.  Pretty much everyone, all the trades and Klewin had to transfer dimension information from the architectural drawings to the structural drawings."  (Tr. 99-100.)  The problems with the designs caused substantial delays at the beginning of the project, because the designs raised many questions that had to be answered before construction could begin.  (Tr. 53-54, 83-84.)  In addition, the grid system on the architectural drawings, prepared by the architect, was not completely accurate and Klewin had to provide its own survey.  (Tr. 100.)  After completing the survey, Klewin realized that there was not complete closure in the project's dimensions and Klewin had to hire an architect to alter the dimensions to achieve closure.  (Tr. 100.)

This affected Oldcastle, because it could not begin fabricating planks until after the necessary supporting framework was constructed and accurate field measurements were given to it.  (Tr. 38, 55.)   According to Oldcastle, this was a "highly unusual" practice, because on most jobs, the subcontractor can fabricate the pieces based on the approved design documents while the preceding construction is progressing and typically does not need to wait for field measurements.[5]  (Tr. 37, 40,

---

[5] On most projects, Oldcastle would be given contract drawings when it accepted a job, which would be used to develop erection and shop drawings for the precast planks for the job.  Those drawings would be submitted to the general contractor's engineer to review for correctness.  (Tr. 36.)

41.) This is one of the benefits of using precast planks because it increases the speed of construction. (Tr. 39, 60-62, 76.)  The complexity of the project and the inconsistencies between the contract drawings and the actual structure resulted in field measurements being done as the job progressed, delaying fabrication of the planks and largely nullifying the benefit of using precast planks.  (Tr. 37; 39-40.) Oldcastle was regularly receiving design changes after the design phase of the project should have been completed and while it was already in the process of fabricating the planks.  (Tr. 54-55, 56, 57-60.)  Even so, there were occasions where the planks were fabricated to the amended specifications but did not fit at the time of installation because of discrepancies between the design measurements and field measurements.  (Tr. 67-68, 70-72.)  On other occasions, erection of precast components was delayed because the prerequisite structure had not been completed or the support angles had not been installed.  (Tr. 67-68; 70-72.)

In addition to the erection schedule, which provided the dates when sections of the project were to be erected, there was an erection sequence, which indicated the order in which the sections were to be erected.  (Tr. 50.)  Klewin revised both throughout the project.  (Tr. 50, 151.)  There were further delays when Klewin began requiring "releases" before Oldcastle could fabricate the planks and began to revise the erection schedule as frequently as once a week.  (Tr. 31, 35, 39, 40-41, 49, 64, 150; Pl. Exs. 17-21.)  Klewin believed that Oldcastle should produce planks whenever it

---

Having reviewed them, the engineer would either: (1) send them back and mark them either "approved for fabrication" or "approved as noted," meaning minor changes are required but they do not need to be resubmitted; or (2) mark them "revise and resubmit," indicating that there are significant changes that need to be made.  (Tr. 36.)  Once the designs were approved by the engineer, Oldcastle would  produce "detail sheets" that released the designs for fabrication and the sheets would be submitted to the shop for production.  (Tr. 36-37, 41, 63-64.)  Once the pieces were made, an erection schedule would be created based on the other construction to be completed on the job and Oldcastle's availability.  (Tr. 37, 63.)

requested them, regardless of Oldcastle's commitments to other clients.  (Tr. 139.)

Problems also arose in coordinating the erection sequence of the subcontractors because the the work to be performed by Oldcastle could not be done until the requisite preceding work was completed.  (Tr. 31, 51-52, 68, 69-70.)  Specifically, the steel would need to be erected, followed by masonry work to supply a supporting framework for the precast planks.  (Tr. 98.)  It was "critical" to the project that these trades were "in tune to the schedule and were following close behind."  (Tr. 98.)   At times, Oldcastle was unable to access areas necessary for its work because other subcontractors were working in those areas before Oldcastle had approved them, as required under the subcontract.  (Tr. 68-69, 73, 74-75; Def. Ex. A ¶ 4.1.11.)  This problem was exacerbated by Oldcastle's inability to conform to the schedule because of the design changes so that the other subcontractors were proceeding with work ahead of the proper sequence.  (Tr. 37-41, 99.)

On June 12, 2003, Klewin's Project Manager, Tufaro, sent a letter to Oldcastle's Vice President of Project Services, Donna Reuter, discussing: (1) his concerns regarding the schedule for the project; (2) problems in communications between Oldcastle and Klewin; and (3) difficulty he was having getting in touch with Navarro.  (Tr. 81, 85-86, 94; Def. Ex. H.)  However, Tufaro addressed the letter to an Oldcastle Facility in Charlton, Massachusetts, rather than Oldcastle's South Bethlehem, New York office, which was handling the project.  (Tr. 85-86; Def. Ex. H.)  Tufaro testified that he was attempting to find someone higher up the chain of command than Navarro and had contacted Peter O'Neill, the sales associate for Oldcastle, who provided him with the Charlton address.  (Tr. 94-96.)  He used it instead of the New York address for Oldcastle, which he admitted was the address specified in the subcontract.  (Tr. 96.)  Although Tufaro never received a written response to this letter, he spoke with Reuter shortly after sending the letter and she assured him that

Navarro would be made available to Klewin and that she would "keep an[] eye on the project." (Tr. 95.) Apparently, Navarro's conduct improved for a brief period of time but again it became difficult for Klewin to get in touch with Oldcastle. (Tr. 97.)

There was also friction as well as communication problems between the individuals on the worksite. The subcontract did not require Oldcastle's Project Manager, Navarro, to attend on-site meetings, but he did frequently attend them when he was available. (Tr. 45-46, 85, 137-138.) Navarro dealt with Klewin personnel, specifically Howard Moses, the site superintendent, and Chuck Shillito, the project engineer. (Tr. 46.) Navarro testified that it was "very difficult" working with Moses who was verbally abusive. (Tr. 47, 48, 73-74.) Due to these concerns as well as concerns about schedule delays on the project, Navarro sent a letter dated July 7, 2003 to Emil Canaan, principal for Klewin. (Tr. 47; Pl. Ex. 1.) Despite the letter, nothing changed at the worksite as Oldcastle continued work on the project. (Tr. 48.)[6]

C.    **Backcharges**

Klewin provided Oldcastle with change orders for work that needed to be corrected or that was incomplete and corrected or completed by others. (Tr. 108; Def. Exs. B-G.) These backcharges were for welding, saw cutting and cleanup. (Tr. 108, 114; Def. Exs. A. Sch. A. at D.3.; MM1.) Under the subcontract, Oldcastle was required to weld steel weld plates on the planks to the steel beams to secure the planks in place. (Tr. 108-14.) Oldcastle was also required to cuts holes in the planks for mechanical shafts and piping and to clean up debris created as a result of its work. (Tr.

---

[6] Navarro claimed that he wrote other letters to Klewin about these problems, but no other letters were produced at trial. (Tr. 82-83.)

114; Def. Ex. A, Sch. A at D.1.)

On October 29, 2003, Tufaro wrote to Navarro to inform him that, because Oldcastle still did not have people available to do welding, Klewin would hire a third-party welder at Oldcastle's expense. (Tr. 111; Def. Ex. O.)  Oldcastle did not respond to this letter.  (Tr. 112, 117.)  Tufaro sent several other letters regarding problems with the welding that Oldcastle was to perform without receiving any response.  (Tr. 112-13; Def. Exs. H-N, P.)  Klewin hired an independent contractor, Kryten Iron Works ("Kryten"), to do the welding.  (Tr. 79, 109, 123; Def. Ex. O.)  Klewin also sent several letters regarding saw cutting to Oldcastle and likewise did not receive a response to these letters.  (Tr. 121; Defs. Exs. T1, U-W.)  Klewin hired T & L Drilling to do the saw cutting.  (Tr. 79-80, 114, 123.)  This pattern was repeated with respect to cleanup costs that were covered by Klewin. (Tr. 122-23; Def. Exs. Z-EE.)  Klewin asserts that Oldcastle also did not complete certain work on the project, such as leveling the underside of planks and replacing window glass damaged by splattering of molten metal particles or slag during welding.  (Tr. 125-26, 134-35.)  This resulted in additional costs.  (Tr. 135; Def. Ex. JJ.)  Klewin gave notice of this work to Oldcastle through its change orders Numbered 1 to 24 which were received by Oldcastle.  (ASAF ¶ 10; Def. Exs. B-G, Q-T, Z-EE, HHH.)  Tufaro admitted that these notices did not comply in all instances with the advance notice requirements in the subcontract.  (Tr. 173-87; Def. Ex. A ¶ 3.3.2.)

Oldcastle did not respond in writing to these backcharges.  (Tr. 110, 114, 196-201; Def. Exs. H-N, P, Q-T.)  Although Oldcastle did some saw cutting and plank trimming on the job, it was unable to complete these tasks because it did not have the people to perform them, as they were assigned to other projects by the time the work needed to be performed on the project.  (Tr. 86-87, 115; Def. Ex. O.)

Klewin assessed backcharges against Oldcastle for: (1) welding, in the amount of $35,192.50; (2) saw cutting, in the amount of $41,830.00; and (3) cleanup, in the amount of $7,005.38.  (Def. Ex. MM1.)  The following chart lists the work performed, the amount sought by Klewin, the date notice was given and the date the task was performed (with the charges as to which proper advance notice was not given being designated by an asterisk):

**Welding Backcharges**

| Work Performed | Amount Sought | Notice Date | Performance Date |
|---|---|---|---|
| Fabricate and install angles | $1,579.00* | 8/11/2003 | 8/12/2003 |
| Fabricate and install plate welded to beam | $1,674.00 | 6/26/2003; 8/25/2003 | 8/14/2003 |
| Weld plank clips to steel | $3,032.00 | 7/14/2003; 9/5/2003; 10/2/2003; | 10/7/2003 |
| Install angles to carry plank | $1,845.00 | 10/2/2003 | 10/7/2003 |
| Fabricate and install level to carry precast plank | $1,849.00 | 10/2/2003 | 10/15/2003 |
| Provide angle to carry plank | $980.00 | 10/2/2003 | 10/17/2003 |
| Weld plank clips to steel | $3,658.00 | 7/14/2003; 9/5/2003; 10/2/2003 | 10/17/2003; 10/20/2003 |
| Support angles for stair landing | $1,204.00 | 6/12/2003 | 10/22/2003 |
| Weld plank clips to steel | $3,883.00 | 7/14/2003; 9/5/2003; 10/2/2003 | 10/23/2003 |
| Weld plank clips to steel | $2,884.00 | 7/14/2003; 9/5/2003 | 10/27/2003 |
| Klewin administrative charge | $1,933.50 | No notice required | No notice required |
| Install support angles | $1,045.00 | 10/14/2003 | 10/30/2003 |

11

| Install plate at top flange | $1,628.00* | 10/29/2003 | 10/31/2003 |
|---|---|---|---|
| Install support angle to precast planks | $1,964.00 | 10/29/2003 | 11/13/2003 |
| Install support angle to carry landing | $816.00 | 10/29/2003 | 11/21/2003 |
| Furnish and install additional support for stair landing | $2,489.00 | 10/14/2003; 10/29/2003; 11/6/2003 | 10/30/2003 |
| Weld connection of precast plank to steel | $2,729.00 | 7/14/2003; 9/5/2003; 10/29/2003 | 11/14/2003; 12/1/2003 |
| **Total** | **$35,192.50** | | |

**Saw Cutting Backcharges**

| Work Performed | Amount Sought | Notice Date | Performance Date |
|---|---|---|---|
| Supply labor and materials to saw cut floor opening | $26,660.00 | 7/29/2003 7/30/2003 9/16/2003 9/30/2003 10/29/2003 | 10/8/2003-10/10/2003; 10/13/2003; 10/14/2003; 10/17/2003; 10/20/2003-10/24/2003; 10/28/2003; 10/29/2003; 11/3/2003; 11/4/2003; 11/6/2003; 11/18/2003-11/21/2003; 11/25/2003 |
| Trim plank | $5,800.00 | 10/14/2003; 10/29/2003 | 10/15/2003; 10/16/2003; 11/13/2003; 11/14/2003 |
| Supply labor and materials to saw cut stair landings | $1,600.00 | 11/12/2003 12/16/2003 | 12/17/2003 |

12

| | | | |
|---|---|---|---|
| Saw cut floor openings | $320.00 | 9/16/2003; 9/30/2003; 10/29/2003 | 12/17/2003 |
| Supply labor and materials to saw cut precast plank floor openings | $3,200.00 | 9/16/2003; 9/30/2003; 10/29/2003 | 12/18/2003; 12/22/2003 |
| Supply labor and materials to saw cut access door | $1,600.00 | 7/30/2003; 9/16/2003; 9/30/2003; 10/29/2003 | 11/26/2003 |
| Supply labor and materials to saw cut wall opening | $1,050.00 | 7/30/2003; 9/16/2003; 9/30/2003; 10/29/2003 | 12/23/2003 |
| Supply labor and materials to saw cut stairway | $1,600.00 | 11/6/2003; 12/16/2003 | 6/24/2004 |
| **Total** | **$41,830.00** | | |

## Cleanup Backcharges

| Work Performed | Amount Sought | Notice Date | Performance Date |
|---|---|---|---|
| Cleanup reinforcing steel, precast plank and grout debris | $440.95* | 9/9/2003 | 8/28/2003 |
| Remove grout stop at ceiling | $405.15 | 9/9/2003 | 10/15/2003 |
| Furnish grout for filling | $737.00 | 9/9/2003 | 12/18/2004 |
| Use chipping gun and sweep excess grout from precast plank | $1,242.56 | 9/9/2003; 1/15/2004 | 3/26/2004 |
| Caulk grooves at precast plank ceiling | $1,294.88 | 3/26/2004 | 7/28/2004 |
| Form Stair D of Independent Wing | $2,884.84 | 10/29/2003 | 9/10/2004 |
| **Total** | **$7,005.38** | | |

D.     **Counterclaim for Damages**

The owner, Ardsley, assessed liquidated damages against Klewin for delay in the amount of $1,536,000, representing 256 calender days at the contractually specified rate of $6,000 per day, and decreased the contract amount accordingly, making the contract price $31,874,356.[7]  (ASAF ¶ 13.) Klewin sent a letter to Oldcastle dated August 25, 2005 to notify Oldcastle of this assessment. (ASAF ¶ 14; Tr. 141; Def. Ex. II.)  Klewin told Oldcastle that it would do its best to limit the assessment, but would apportion a share of the ultimate assessment to Oldcastle.  (ASAF ¶ 14.)

William F. Carlson, PE, an expert in construction scheduling, management of construction and civil/structural engineering, using the Primavera Scheduling System,[8] computed that Oldcastle, by its delays in fabrication and erection of precast planks, had delayed the project fifty-two days. (Tr. 207-10; Def. Exs. NN, MMM.)

The surety's Answer to Oldcastle's Complaint included a counterclaim for $312,000, representing the fifty-two days of delay allegedly attributable to Oldcastle at the liquidated rate of $6,000 per day specified in the prime contract between Klewin and Ardsley.  There was no counterclaim for actual damages sustained by Klewin as a result of Oldcastle's alleged delays.

---

[7] The original contract price was $32,400,000 plus change orders of $1,010,356 making the contract sum $33,410,356, which, decreased by $1,536,000 for the assessments, leaves a balance of $31,874,356.

[8] According to Carlson:
Primavera is a software company that produces software that is typically recognized throughout the construction industry as the appropriate software to analyze schedules, keep track of progress on jobs, to be able to project delays and to determine impacting factors.  It is the most widely used . . . and recognized product. It is used by most municipalities.  And in addition, it is a requirement that Klewin use Primavera and maintain an electronic schedule through their contractor, the owner.
(Tr. 208.)

Oldcastle did not file a reply to this counterclaim, apparently because it sought to hold Oldcastle responsible for a share of liquidated damages, a claim not provided in the subcontract.

After Carlson had prepared his initial expert report to support the surety's counterclaim for a share of the liquidated damages, the surety's counsel apparently belatedly recognized the lack of contractual basis for that claim and had Carlson prepare an amended report to support a claim for Klewin's actual damages in addition to a share of the liquidated damages. The amended report, defendant's exhibit NN, concluded that Klewin's "general conditions" or time-variable overhead expenses on the project amounted to $5,741 per day so that Oldcastle's fifty-two days of delay had cost Klewin $298,532 in addition to the aforesaid share of liquidated damages. Carlson thus computed that the total daily cost of the delay was $11,741 ($6,000 plus $5,741) so that Oldcastle's fifty-two days of delay had cost Klewin $610,532. (Def. Ex. NN at 13.) However, defendant never amended its counterclaim to seek any damages beyond the $312,000 share of liquidated damages.[9] Defendant now asks the Court to permit amendment of the counterclaim to conform to the evidence and to raise the amount sought to $610,532.

Oldcastle contends that the surety is liable to it in the amount of $176,125.04, which is the balance of the subcontract ($192,311.04) minus a backcharge for welding ($16,186.00), plus interest and attorneys' fees.

---

[9] Defendant now claims that, as a result of Oldcastle's breach of contract with Klewin, Oldcastle is liable to it in the amount of $564,130.57, which is the total of the backcharges ($84,027.88), the punchlist work ($61,881.73) and the damages for delay ($610,532.00), less the subcontract balance ($192,311.04). (Def. Ex. MM1.).

## CONCLUSIONS OF LAW[10]

### I.      Liability

#### A.      Plaintiff's Breach of Contract Claim

It is well established that "'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)).  "Under New York law each party to a construction contract impliedly agrees not to hinder or obstruct [the other's] performance. Indeed, each party has an affirmative obligation to facilitate the other's performance." *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007 (2d Cir. 1991) (internal citations omitted) (alterations in original).  Failing to properly perform preparatory work can constitute a breach of the obligation not to hinder the other party's performance. *See Quaker-Empire Constr. Co. v. D. A. Collins Constr. Co.*, 88 A.D.2d 1043, 1044, 452 N.Y.S.2d 692 (3d Dep't 1982)

---

[10] As a federal court sitting in diversity jurisdiction pursuant to 28 U.S.C. § 1332, we must apply the choice of law rules of the forum state, i.e., New York.  *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538 (2d Cir. 1997).  In determining which state law to apply in contract cases, New York applies the "center of gravity" or "grouping of contacts" approach. *Id.* at 1539.  "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.*  It is clear that New York has the most significant contacts and interest in the suit.  Oldcastle is a Washington corporation with its principal place of business in South Bethlehem, New York.  The surety is a foreign corporation organized and existing by virtue of the laws of Maryland with offices in Hartford, Connecticut.  The subject matter of both the contract and subcontract was the Woodland Project in Ardsley, New York and performance of the subcontract occurred in New York.  In addition, the subcontract contains a paragraph 6.1 which state that all disputes regarding the subcontract are to be litigated in Supreme Court, Westchester County and that both parties consent to the jurisdiction of that court.  Obviously, the parties have waived this provision by bringing and not objecting to the claim brought in this Court, but this provision lends further support to the argument that the subcontract has extensive connections to New York.  Therefore, New York law will govern.

("The delay and improper performance of the preparatory work by [defendant] . . . , and not within the contemplation of the parties when their contract was executed, constituted a material breach of [defendant's] implied obligation not to hinder or obstruct plaintiff's performance."); *see also S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1026 (S.D.N.Y. 1984) (citing *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308 (N.D.N.Y. 1979)) (finding that the contractor delayed the subcontractor's performance by making "numerous design changes that altered the character of plaintiff's work").

Oldcastle asserts that it performed in satisfaction of the subcontract provisions and that it was design changes from Klewin that caused delays in the completion of the subcontract.  In addition, Klewin required that the drawings be "released," or approved by it before fabrication, which caused further delays.  (Tr. 40-41, 63.) The evidence presented at trial indicates that this initial schedule was delayed in major part because of problems with the structural and architectural designs as well as design changes to the precast planks after the design phase of the project should have been completed. (Tr. 53-54; 98-99.)  These constant design changes delayed Oldcastle's performance and at least partially nullified the advantage of using precast planks.  Oldcastle's work was further hindered because it was unable to access some areas due to other subcontractors improperly occupying these areas before Oldcastle's work was completed.  (Tr. 68-69.)  The subcontract explicitly requires Klewin to make sure areas were cleared so Oldcastle could perform its work. (Def. Ex. A, OCP at 6.)  Oldcastle substantially completed the job of fabricating and installing precast planks pursuant to the subcontract.  (Tr. 153, 167; Def. Ex. SS.)  Therefore, Oldcastle is entitled to the balance of the subcontract price, less the backcharges for the work that Klewin paid for after proper notice to Oldcastle.

**B.**    <u>**Defendant's Claim for Backcharges**</u>

The subcontract contains several inconsistent provisions regarding notice of incomplete or defective work.  Article 3.3.2., under the section "Claims by the Contractor," provides seven days written notice for the contractor's claims for "services and materials" provided by the subcontractor.  Article 3.4.2., under the section "Contractor's Remedies," provides that should the subcontractor fail to provide sufficient workmen or materials or cause delay or fail to perform under the contractor, the contractor may, after serving forty-eight hours written notice and providing an additional forty-eight hours to "take such steps as are necessary to overcome the condition."  Should the contractor do this, the subcontractor "shall be liable for to [c]ontractor for the direct costs thereof."

Under New York law, "[w]here there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls."  *Aguirre v. City of New York*, 214 A.D.2d 692, 693, 625 N.Y.S.2d 597 (2d Dep't 1995); *see Travelers Indem. Co. of Ill. v. F&S London Pub, Inc.*, 270 F. Supp. 2d 330, 334 (E.D.N.Y. 2003); *Solid State Logic, Inc. v. Terminal Mktg. Co.*, No. 02 Civ. 1378, 2002 WL 1586977, at *4 (S.D.N.Y. July 18, 2002).  Here, article 3.4.2. of the subcontract specifically applies to the charges that defendant is seeking to collect because those charges are for alternatives services that Klewin had to obtain to complete work that Oldcastle was obligated to perform but failed to perform.  Therefore, Klewin was required to give Oldcastle forty-eight hours notice and an additional forty-eight hours to cure—four days total—before incurring costs that could be backcharged against Oldcastle.

In addition to arguing the applicable notice provision, Oldcastle directs the Court to several contract provisions which, it maintains, defeat defendant's claim for backcharges.  Plaintiff contends that the subcontract, pursuant to the additional terms and conditions in the contract proposal,

18

specifically limits its liability to repair or replacement of goods.  The subcontract states, "Seller expressly limits any liability for damages resulting from the *furnishment* of goods under the agreement, to repair or replacement of the furnished product.  Seller shall not be liable for any direct or indirect consequential damages that may arise from the product furnished under this agreement." (Def. Ex. A, OCP at 10 (emphasis added).)  This provision relates only to damages resulting from defects in the furnished product.  Here, the damages defendant claims resulted from Oldcastle's delay in fabricating and installing the product and not from any defect in the furnished product. Therefore, this subcontract provision is inapplicable.

In addition, Oldcastle relies on article 11.1.2. of the subcontract for the proposition that payment "indicated evidence satisfactory to Contractor and Owner that all obligations resulting from Subcontractor's performance to that point had been satisfied."  (Pl. Reply PTB at 3.)  In pertinent part, article 11.1.2. states:

> Each application for payment shall include evidence satisfactory to Contractor and Owner that all obligations resulting from Subcontractor's performance to that point have been satisfied.  Subcontractor shall submit with each application for payment Subcontractor's Waiver of Mechanic's Lien and Claims (Schedule D) made conditional upon actual receipt of payment for all funds paid to Subcontractor by Contractor including the current application period, a certified list of Sub-subcontractors and suppliers included in the application for payment and such other documents or instruments that may be required by Contractor or Owner, all executed by a duly authorized representative of Subcontractor and Waivers of Lien and Claims executed by each of Subcontractor's sub-subcontractors, rented or leased equipment suppliers and material suppliers who performed services or supplied materials in connection with the Work to that point.

(Def. Ex. A ¶ 11.1.2.)  This provision requires Oldcastle, in applying for payment, to certify that it has properly performed its work under the contract and paid its subcontractors and suppliers.  It does not mean that Klewin, by paying for the work, waives any objection to its quality or to delay in its

performance.

Oldcastle also directs the Court to a subcontract provision that states "seller will not be responsible for any work, charges or billing made by the Purchaser or his sub-contractor unless previously agreed to in writing."  (Def. Ex. A, OCP at 10.)  However, as previously stated, the subcontract contains a notice provision that explicitly defines the contractor's remedy for the subcontractor's failure to perform.

Under the terms of the subcontract, there was a different notice requirement for cleanup costs. (Def. Ex. A, Sch. A at D.3.)  Specifically:

> Failure of Subcontractor to comply with clean-up provisions will result in Construction Manager performing the work and backcharging Subcontractor. Forty-eight (48) hours' written notice will be issued to the Subcontractor only for the first occurrence of non-compliance with the clean-up provision, but, thereafter cleanup will be continued by Construction Manager and the costs back-charged to Subcontractor, including applicable overhead supervision and administrative costs.

(*Id.*)  It is clear that Klewin needed to provide only forty-eight hours notice for cleanup costs. Defendant is entitled to credit for all backcharges as to which there was compliance with the  notice requirements of the subcontract.

## C.  **Defendant's Breach of Contract Counterclaim**

### 1.  **Claim for Liquidated Damages**

There are several obstacles that stand in the way of the surety's counterclaim for damages based on Ardsley's assessment against Klewin for liquidated damages for delay in completion of the project.

First and foremost, there is no provision in the subcontract for such a claim.  The parties to

the subcontract agreed to delete from it the provision that Oldcastle would be liable for the portion of any liquidated delay damages assessed against Klewin that was attributable to delay caused by Oldcastle. Oldcastle's Brian Tinneny testified that the deletion of this provision was critical to Oldcastle's acceptance of the subcontract because he would not expose Oldcastle to a major, indeterminate liability in order to secure this job. (Tr. 12-14.) This is understandable considering that Oldcastle's gross revenue for fabricating and installing the precast planks was less than $1.4 million (and its potential net profit only a small fraction of that amount), whereas the liquidated damages that Klewin had contracted to pay to Ardsley were set at $6,000 per day so that Oldcastle's possible share of those damages could quickly wipe out its modest profit and even burden it with a financially disastrous loss (as would the $312,000 share of the assessment that defendant seeks to lay off on Oldcastle).

The subcontract as executed gave Klewin a different remedy for Oldcastle's default or delay in fulfilling its obligation to fabricate and install precast planks: after notice of the deficiency, Klewin could employ another company, at Oldcastle's expense, to complete the work or repair defects in the work done by Oldcastle. Klewin repeatedly availed itself of this remedy, as indeed it was obligated to do to mitigate its damages.

Defendant argues that the deletion of the liquidated damages provision from the subcontract is "parol evidence" that cannot be relied upon to change the meaning of an unambiguous written agreement. The Court finds that familiar principle inapposite in the present context. The deletion of the provision clearly precludes construction of the contract as though it still contained that provision, unless the provision was merely redundant of other provisions that remain in the contract and unambiguously impose the same liability on Oldcastle. There are no such other provisions.

Defendant also argues that the amount it seeks from Oldcastle is not liquidated damages but actual damages because it will have to pay the assessment. The Court cannot agree. The $6,000 per day assessment was an arbitrarily fixed or liquidated rate, rather than a measure of Ardsley's actual damages. Any share of it paid by Oldcastle would still be a share of liquidated damages—the very type of penalty the parties to the subcontract agreed would not be imposed on Oldcastle.[11]

Furthermore, neither Klewin nor the surety has actually paid the assessment. The parties have informed the Court that there is a pending state court action in which the propriety of the assessment is being contested. Certainly until either Klewin or the surety has actually paid the assessment it will not have caused the surety to suffer any damages either actual or liquidated. Even if the claim had merit, which it does not, it is clearly premature.

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)). Ripeness doctrine's basic rationale "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas*, 473 U.S. at 580-81. In determining whether a matter is ripe for review, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas*, 523 U.S. at 301 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *see also AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir. 1993). Klewin's claim for damages against Oldcastle is contingent on Klewin paying liquidated damages to Ardsley. It is uncertain how great an assessment,

---

[11] Article 15.6., which was deleted from the AIA standard form agreement, would have required Oldcastle to pay the portion of any liquidated damages assessed against Klewin attributable to Oldcastle's failure to perform its work diligently and properly.

if any, Klewin will ultimately have to pay.

Finally, there is no convincing proof as to the portion of the overall project delay that is properly attributable to Oldcastle. As may be appreciated from the previous discussion, it is extremely difficult to apportion accurately among the general contractor and all of its subcontractors and suppliers their fair shares of responsibility for the overall project delay. As detailed above, much of the delay in fabricating and installing the precast planks was not the fault of Oldcastle but was caused by circumstances beyond its control, such as repeated design changes, inaccuracies in the drawings supplied to it, discrepancies between the drawings and the field measurements and untimely occupancy of Oldcastle's working area by other trades.

Defendant's expert Carlson expressed the opinion that Oldcastle was responsible for fifty-two days of delay, or approximately 20% of the total of 256 days of overall project delay so that, at the liquidated rate of $6,000 per day, Oldcastle's share of the assessment is $312,000. This apportionment was calculated on a proprietary software program whose methodology was not explained to the Court and may have been unknown to Carlson himself. Thus, the Court is asked to take, essentially on blind faith, the product of a "black box" algorithm, with no way of knowing whether all of the extraneous circumstances that impeded Oldcastle's performance of its work were properly considered. Even a perfect computer program cannot produce accurate results unless the input data are complete and correct.

On its counterclaim for a share of the delay damages assessed against Klewin, defendant has the burden of proof. This requires it to prove the extent of Oldcastle's responsibility for the overall project delay with at least a reasonable degree of reliability. This it has failed to do, so that even if the subcontract made Oldcastle liable for a share of the liquidated damages, which it does not,

defendant has not met its burden of proving what that share should be.

For all the foregoing reasons, defendant's counterclaim for a share of the assessment for liquidated delay damages is dismissed.


### 2.   Claim for Actual Damages

Because Carlson's amended report, exhibit NN, gave Oldcastle notice, almost four months before trial, that actual damages were also being sought and, at the request of Oldcastle's counsel, the time for discovery was extended to permit them to depose Carlson and to obtain their own expert to issue a responsive report, and the trial was conducted on the assumption that the issue of actual damages was in play, defendant's counterclaim will be deemed amended to seek both liquidated and actual damages in the amount of $610,532.  To be fair to Oldcastle, their failure to reply to the counterclaim will not be treated as an admission of liability and they will be deemed to have entered a general denial of all the allegations of the counterclaim as thus amended.

As discussed above, there has been no satisfactory proof of the portion of the delay in the overall project completion that is properly attributable to Oldcastle.  This same shortcoming undermines the claim against Oldcastle for a share of the increase in Klewin's "general conditions" or overhead costs resulting from the overall project delay.

Carlson attempted to show by a chart, defendant's exhibit MMM, that at three stages of Oldcastle's work, the elapsed time between the "release" of the final drawings and the actual erection of the precast planks exceeded the eight weeks permitted by the subcontract.  Thus Carlson concluded that Oldcast was responsible for a total of ten weeks or seventy calendar days of delay.  However, this chart, as to all three stages, erroneously failed to take into account changes in the

erection schedule which substantially reduced or totally eliminated any delay attributable to Oldcastle.

For example, drawing number 11S was released June 26, 2003 and the planks were installed September 22, 2003, thirteen weeks later, which Carlson assumed to be five weeks more than the eight weeks allowed. However, he failed to take into account that, as shown by defendant's exhibit QQ, the agreed erection date for these planks was extended to Friday, September 19, 2003, only one working day (three calendar days) before the actual erection date of Monday, September 22.

Exhibit MMM shows that drawing number 15 was released on August 15, 2003 and the planks were actually erected on October 30, 2003, eleven weeks later, from which Carlson assumed that Oldcastle was responsible for three weeks delay. However, plaintiff's exhibit 20 shows that Klewin extended the erection date to October 20, so that the actual delay was only ten calender days.

Exhibit MMM shows that drawing number 18 was released September 16, 2003 and the precast planks were actually erected on November 24, 2003, ten weeks later, so that Carlson assumed that Oldcastle was responsible for two weeks delay. However, plaintiff's exhibit 21 shows that Klein transmitted modified drawing 18 to Oldcastle on October 7, 2003, so that the erection date was well within the allotted eight weeks thereafter.

Taking these corrections into account, Oldcastle was responsible not for the seventy calendar days of delay computed by Carlson, but no more than a total of thirteen calendar days. Oldcastle has not offered any excuse for these delays. The Court therefore concludes that the surety is entitled to judgment on its counterclaim in the amount of $74,633 (thirteen days at $5,741 per day).

3.      **Claims for Punchlist Work**

Defendant contends that it is entitled to credit in the amount of $61,881.73 for the work not completed by Oldcastle which was included on the punchlist.  Specifically, it claims that Oldcastle damaged window sashes with welding splatter, failed to level the underside of installed planks and failed to supply "as-built" drawings.

In assessing the charge for welding splatter, defendant appears to be relying on exhibit JJ, which is a letter dated March 10, 2005 from Tufaro to Navarro.  (Def. Ex. JJ.)  This letter indicates that the architect's punchlist notes several areas of welding splatter which he states are "a direct result of Oldcastle welding connecting plates after window installation with no protection."  (*Id.*)  However, the architect may have been wrong in assuming that the welding that caused the damage was done by Oldcastle.  Defendant's exhibit O, another letter from Tufaro to Navarro dated October 29, 2003, states that Navarro "[a]t the subcontractor meeting of October 22, 2003 . . . advised Klewin to continue welding plank to structural steel since [Oldcastle] did not have people available to do this work, and [Oldcastle] did not know when they would be available."  (Def. Ex. O.)  Based on this representation, Klewin had Kryten continue to perform the welding.  While Klewin relies on this letter in support of its position that it was required to find another subcontractor to do welding, and backcharge Oldcastle for this work, the letter also indicates that Oldcastle performed only a portion of the welding on the project and that Kryten performed the rest.  (Tr. 58-59, 195; Def. Ex. O.)  We find there is insufficient evidence to attribute the welding splatter to Oldcastle, and therefore conclude that defendant cannot recover from Oldcastle the costs of repairing the damage caused thereby.

Defendant also seeks the estimated cost of leveling the underside of the precast planks, or

26

$48,500.  It was important that the undersides be level because they would be exposed as the ceiling

for the the housing unit below.  (Tr. 123-25; 133-34.)  This work was required of Oldcastle under

the subcontract and was not completed.  (Tr. 125.)  In an unspecified number of rooms, the unlevel

condition was covered up by dropped sheetrock ceiling.  (Tr. 194-95.)  In the remaining rooms the

uneven condition was rendered less apparent by covering it with popcorn paint.[12]  (Tr. 127.)  The

number of rooms that still require leveling is unclear.  It is also doubtful whether that work will ever

be done.  (Tr. 260.)  Nevertheless, article 1.2. of the subcontract indicates that the general conditions

governing the subcontract are contained in the 1997 Edition of the AIA Document A201, which was

attached at the end of the subcontract.  (Def. Ex. A ¶ 1.2.)  The AIA document contains a section

entitled "Acceptance of Nonconforming Work" that states:

> If the Owner prefers to accept Work which is not in accordance with the
> requirements of the Contract Documents, the Owner may do so instead of requiring
> its removal and correction, in which case the Contract Sum will be reduced as
> appropriate and equitable.  Such adjustment shall be effected whether or not final
> payment has been made.

(Def. Ex. A, Draft ¶ 12.3.1.)  Defendant therefore would have a valid claim for the cost of leveling

the ceiling in as many of the rooms as it actually proved to require such remediation, even though

that work may never be performed.

However, on the record before the Court, it is impossible to determine how many rooms have

ceilings that still require remediation.  Defendant's expert Carlson estimated that there are forty such

rooms.  But he inspected only "about 15" rooms which he termed a "representative sample."  (Tr.

258-59.)  There is reason to doubt that the rooms he inspected were really representative, because

---

[12] Tufaro testified that popcorn paint is paint that is mixed with bits of styrofoam to give the
paint a rough texture.  (Tr. 127.)  It can be brushed or sprayed on a surface.  (*Id.*)

he allowed the owner and the architect each to select four or five of the rooms he inspected and they would obviously have an incentive to pick rooms they believed to have the worst ceilings. Moreover, Carlson did not say how many of the rooms he inspected had ceilings requiring remediation.  He only estimated that, assuming these rooms were typical, a total of forty rooms in the project had such ceilings.  The record does not indicate how many rooms there are in the entire project.  Assuming, for example, that there are 400 rooms in all, forty rooms would represent 10% of them.  On that assumption, Carlson must have found that 10%, or only one or two of the fifteen rooms he inspected, were substandard.  That is too flimsy a basis for fixing a charge against Oldcastle for work that will probably never be done.

Finally, defendant contends that Oldcastle is liable to Klewin for $2,000 for "as-built" drawings.  We are unable to find in the record any evidence that Oldcastle was required to provide such drawings.  In its brief, defendant states, "Oldcastle has admitted that item 87, in response to the fourth request for admissions, that the as-built drawings have not been submitted." (Def. PTB at 34-35.)  This request for admission was not offered in evidence at the trial, nor has it ever been filed with the Court.  In addition, defendant cites exhibit LL1 which is a fax from Tufaro to Navarro dated March 18, 2005 stating that the letter is a final request for closeout documentation.[13]  The letter lists several items being attributed to Oldcastle including $2,000 for "as-builts."  (Def. Ex. LL1.)  But because there is no basis in the record for imposing on Oldcastle an obligation with respect to "as-builts," defendant has not established that it is entitled to an award based thereon.

---

[13] The letter indicates that this request is "per our letter of February 25, 2005."  (Def. Ex. LL1.)  However, a copy of the letter dated February 25, 2005 was not an exhibit at the trial nor was it ever supplied to the Court.

II.  **Damages**

Oldcastle seeks to recover $176,125.04, which represents the balance of the subcontract, $192,311.04, less the credit for welding backcharges, $16,186.00 plus interest and attorneys' fees. (Pl. PTB ¶ 37.)   As stated above, Oldcastle substantially performed its obligations under the subcontract and is entitled to the unpaid balance of the subcontract, or $192,311.04, less the backcharges for the work as to which it was given proper notice.

As the above chart indicates, defendant sought backcharges in the following amounts: $35,192.50 for welding; $41,830.00 for saw cutting; and $7,005.38 for cleanup costs.  However, subtracting the charges for which proper notice was not provided as noted in the chart, defendant is entitled to a credit of $31,985.50 for welding;[14] $41,830.00 for saw cutting; and $6,564.43 for cleanup costs.[15]   In total, therefore, Klewin is entitled to an offset of $80,379.93 for backcharges. Oldcastle completed its work in early January 2004 and was entitled to payment by February 1, 2004, so it will be awarded interest from that date.

On its counterclaim, defendant is awarded $74,633 in actual damages.

With respect to Oldcastle's claim for attorneys' fees, "'a court can consider attorneys' fees only if they are reasonable and are provided for by contract or state statute.'" *Graubart v. Jazz Images, Inc.*, No. 02 CV 4645, 2006 WL 1140724, at *5 (S.D.N.Y. Apr. 27, 2006) (quoting *Greenberg v. Trace Int'l Holdings, Inc.*, No. 99 Civ. 0306, 1999 WL 587935, at *4 (S.D.N.Y. Aug.

---

[14] These numbers reflect subtractions for insufficient notice in the amount of $1,579.00 for fabrication and installation of an angle for which one-day notice was given and $1,628.00 for installation of a plate for which two days notice was given.

[15] This number reflects a subtraction of $440.95 for cleaning up reinforcing steel, precast plank and grout debris for which no notice was given.

4, 1999). Oldcastle has not directed this Court to any language in the subcontract nor to any state statute that provides for attorneys' fees to be awarded against the surety and we have been unable to locate any such provision. Therefore, Oldcastle cannot recover these costs.

## SUMMARY

For all of the foregoing reasons, we find and conclude that plaintiff Oldcastle Precast, Inc., on its breach of contract claim is entitled to judgment against defendant United States Fidelity and Guaranty Company (the "surety") in the amount of $111,931.11, representing the balance of the subcontract price of $192,311.04, less backcharges in the amount of $80,379.93, plus interest thereon at 9% from February 1, 2004 to the date of judgment.

Defendant, the surety, on its counterclaim, is entitled to judgment against Oldcastle in the amount of $74,633.

Settle Judgment Order on notice.

SO ORDERED.

Dated: White Plains, New York
      October  4 , 2006

_William C. Conner_
Sr. United States District Judge

30